**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| STANIKA JACKSON, | ) | |
| | ) | CASE NO.    1:10-cv-0763 |
| Plaintiff, | ) | |
| | ) | JUDGE BOYKO |
| v. | ) | |
| | ) | MAGISTRATE JUDGE VECCHIARELLI |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

This case is before the magistrate judge on referral.  Plaintiff, Stanika Jackson
("Jackson"), challenges the final decision of the Commissioner of Social Security
("Commissioner"), denying Jackson's applications for a period of Disability Insurance
Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), and for
Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("Act"), 42
U.S.C. §§ 423 and 1381(a).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons given below, the decision of the Commissioner should be
AFFIRMED.

I.  Procedural History

Jackson applied for DIB and SSI on July 28, 2005, alleging disability as of August
31, 2002 from abdominal problems, hernias, complications from surgery, intestinal
problems, and a buildup of scar tissue.  Her application was denied initially and upon
reconsideration.  Jackson timely requested an administrative hearing.

On April 24, 2007, Jackson submitted for the first time evidence of psychological impairments.  This evidence included records from South Pointe Hospital relating to a behavioral evaluation of Jackson on November 30, 2006, psychological progress notes from December 1, 2006 through March 1, 2007, and notes from two psychiatric therapy sessions on April 19, 2007 and February 12, 2008.

Administrative Law Judge Stephen M. Hanekamp ("ALJ") held a hearing on June 17, 2008.  Jackson was represented by counsel at the hearing, and she testified on her own behalf.  Gene Burkhammer testified as a vocational expert ("VE").  The ALJ did not solicit the testimony of a medical expert regarding Jackson's psychological limitations.  The ALJ issued a decision on October 15, 2008 in which he determined that Jackson is not disabled. When the Appeals Counsel declined further review on July 29, 2009, the ALJ's decision became the final decision of the Commissioner.

Jackson filed an appeal to this court on April 13, 2010.  Jackson alleges that the ALJ's decision is not supported by substantial evidence because (1) the ALJ failed to elicit at the hearing the opinion of a medical or psychological expert regarding Jackson's mental impairments and (2) the ALJ failed to include the limitations resulting from Jackson's mental impairments in his hypothetical question to the VE and in his assessment of Jackson's residual functional capacity ("RFC").  The Commissioner denies error.

II.  Evidence

A.    *Personal and Vocational Evidence*

Jackson was born on January 2, 1976 and was 26 years old at the alleged onset of disability.  She has a high school education and has past work experience as a barmaid and a nurse's aide.

2

B.    *Medical Evidence*

On April 25, 2003, Jackson visited South Pointe Hospital, complaining of abnormal vaginal bleeding and chronic pelvic pain. Transcript ("Tr."), pp. 147-49, 183-87.   She reported that the same symptoms had occurred about a year earlier as well.   A hysteroscopy conducted on April 30, 2005 revealed dysfunctional uterine bleeding (TR 148, 184).

South Pointe Hospital admitted Jackson on July 28, 2003.  Tr. at  153-58, 168-73, 219-35.  Jackson reported cramping, nausea, and vomiting.  Elizabeth Habjan, D.O., and Marc Snelson, M.D., examined Jackson on July 29, 2003 and concluded that she suffered from anemia, a urinary tract infection, trichomonas, and an unidentified mass in her right pelvis.  Jackson was treated for the infection and given an ultrasound of the pelvic mass and a colonoscopy.  The colonoscopy revealed irritable bowel syndrome and an extremely redundant colon.   A surgical procedure on August 1, 2003 removed the pelvic mass. Jackson reported abdominal and chest pain after surgery.  On August 3, 2003, Jackson suffered from fever, dizziness, and an elevated white cell count.  The attending physicians diagnosed anemia and dehydration, and they administered Phenergan intravenously. Jackson suffered from nausea and vomiting for two days.  Dr. Habjian; Peter Cohn, M.D.; and Jacob Yannetta, D.O., detected tenderness in the right flank and diagnosed postoperative ileus, and chest x-rays indicated bilateral pleural fluid effusions.

South Pointe admitted Jackson on March 2, 2004 complaining of sharp, diffusive, cramping; abdominal pain; fever; and chills.  Tr. at 161-66, 189-217, 431-32.  A series of x-rays detected a small bowel obstruction.  On March 4, 2004, Jackson underwent an exploratory laparotomy with lysis of adhesions and a small bowel resection.  Following

3

surgery, Jackson was also diagnosed with hypokalemia, anemia, hypotension, and euglycemia. She received transfusions and dietary recommendations. By March 11, 2004, Jackson complained of significant abdominal pain, and she had an elevated white blood cell count. Postoperative ileus interfered with eating. South Pointe discharged her on March 13, 2004 with instructions not to drive or lift more than 20 pounds, with more tests scheduled.

On September 8, 2004, Jackson underwent an Affirm VP III test at University Primary Care Physicians. Tr. at 342. The results were positive for garderella.

On November 11, 2004, Jackson visited the Lee-Harvard Family Practice ("Lee-Harvard") complaining of headache, burning and heaviness in her chest, cramping, and dizziness. Tr. at 253-55. Jackson was then working as a barmaid, and she said that she came home about 6:30 p.m., fell asleep by 8, then woke again at 2 a.m. and watched television. She thought that she might be suffering from depression. Jackson also reported taking four Extra Strength Tylenol 500 mg tablets a day a day and daily muscle relaxants. Rochele Beachy, M.D., told Jackson to resume Pepcid for acid reflux and renewed Jackson's prescriptions for Trazadone and Ultram.

Jackson received her annual physical from Daniel Rzepka, M.D., on April 22, 2005. Tr. at 334-41. Jackson complained of continuous cramping and reported that she was taking a triple dose of Naprosyn for pain. Dr. Rzepka ordered an Affirm VP III test which was positive for garderella and trichomonas.

On May 5, 2005, Jackson received an ultrasound at University Primary Care Physicians. Tr. at 343-46. The test revealed a new cystic complex. After additional tests and examinations, Jackson was diagnosed as having a nabothian cyst.

4

On June 28, 2005, Jackson was admitted to Huron Road Hospital for elective ventral hernia repair and laparoscopy, and for complaints of increasing abdominal pain and nausea.  Tr at 257-76.  She was diagnosed as suffering from a ventral hernia and cholelithiasis.  Jackson had blood in her stool and severe constipation.  A colonoscopy revealed erythema in the rectum, and Jackson was scheduled for surgery and released. Jackson underwent surgery on July 6, 2005.  The surgery found multiple ventral hernias requiring extensive lysis of the adhesions, multiple gallstones, many fascial defects in the midline, and a new ovarian cyst.  The surgeons removed Jackson's gall bladder during the procedure.  Postoperatively, Jackson complained of cramps, evinced a guarded gait due to abdominal pain, had delayed bowel movements, and suffered a breakdown of the midline abdominal wound.  She underwent physical therapy during her stay to reduce her pain upon walking.  She received iron sulfate for her continuing anemia.

Jackson visited Sami Moufawad, M.D., at South Pointe Hospital on September 20, 2005.  Tr. at 396-97, 399-400.  Dr. Moufawad noted that Jackson's abdominal pain began after ovarian surgeries in 2002.  Jackson reported that she could relieve her abdominal pain by grabbing her abdominal wall.   Dr. Moufawad could not deeply palpate Jackson's abdomen due to sensitivity.  Dr. Moufawad continued Percocet, Cymbalta, and Flexeril and added a Lidoderm patch.  On October 21, 2005, Dr. Moufawad told Jackson to take two 30 mg. tablets of Cymbalta at night.  Tr. at 398.  On December 2, 2005, Jackson reported that the Cymbalta was beginning to help with anxiety and depression as well as pain.  Tr. at 416.

Jackson received hypogastric block injections on November 11, 2005.  Tr. at 428-29.

On December 12, 2005, Dr. Moufawad examined Jackson.  Tr. at 416-17.  Jackson

5

complained of pain in the area of her right rib cage, low back pain, pelvic pain, and laryngitis.  The doctor noted that she was taking Methadone three times a day and Percocet to control pain.  She was also taking Lyrica for neuropathy.  Jackson denied constipation, nausea, or vomiting.  Dr. Moufawad recommended exercises for her back pain, with the possibility of trigger point injections if the exercises proved ineffective.

Jackson returned to Dr. Moufawad for a follow-up examination on January 9, 2006. Tr. at 414-15.  Jackson reported that she continued to have spasms but her symptoms were more or less under control.  She was, however, limited in what she could do.  She said that she was able to function with her pain medication.  Examination found tightness in the lower back.  Dr. Moufawad diagnosed neuropathic pelvic pain and low back pain, continued methadone and Percocet, and added Aciphex for gastric burning.

Jackson reported to Lee-Harvard on March 23, 2006 without an appointment and announced that she had been suffering from pain and severely swollen ankles for three days and needed to see a doctor.  Tr. at 477. The attending nurse told Jackson that she must be evaluated by a doctor before she could be treated, and this required an appointment.  The nurse found Jackson to be obese and recommended that Jackson maintain a healthy diet, exercise, and quit smoking.  Jackson agreed, except to say that she was unable to exercise at that time.

Jackson returned to Lee-Harvard for a follow-up examination on March 31, 2006. Tr. at 347.  Dr. Constance D. Margoulias, M.D., noted that Jackson had visited South Pointe recently complaining that her legs had been swollen for four days.  She also reported that the problem improved after taking Lasix for five days.  Jackson complained of ankle and joint pain and said that her left shoulder kept going out.

6

On June 2, 2006, CT scans revealed two ventral herniae.  Tr. at 356-7.  Jackson visited Huron Road Hospital on June 5, 2006, reporting a pulling epigastric sensation and a poor appetite.  Jackson also complained of low back pain and low tolerance to cold. Tests found no abnormality.  Tr. at 352-53.

On September 26, 2006, Jackson underwent surgery to repair her ventral hernia. Tr. at 373-89.  The surgery went well, but afterward Jackson complained of pain and body aches.  On October 6, 2006, Jackson reported that her abdominal pain was exacerbated by movement.  Tr. at 390-93.  She also reported nausea, diarrhea, and acid reflux.

Jackson returned to South Pointe for a follow-up examination with Sherif A. Salama, M.D., on October 26, 2006.  Tr. at 426-27.  Jackson complained of pain which she described as a constant, generalized aching, ranging from 5/10 to 10/10 in intensity.  She asserted that pain was worse with every activity and improved only with rest and medication.  She said that she had not tried a water exercise program or therapy.  Jackson denied vomiting, nausea, or gastrointestinal symptoms.  She also denied smoking.  Dr. Salama found her gait to be normal and found tenderness over the paramedian area bilaterally and on the rectus abdominis muscle.  Jackson wore an abdominal support.  Dr. Salama recommended water exercise, physical therapy, and a pain management program to try to reduce her pain medication.  Jackson resisted these recommendations.

During an examination of Jackson on November 14, 2006 by Marc Allen, M.D., Jackson reported persistent, intractable pain.  Tr. at 395.  Dr. Allen noted that she was not in acute distress at the time of the examination.  After an examination, Dr. Allen assessed Jackson as suffering from abdominal pain, pelvic pain, and lumbar radiculitis and prescribed caudal blocks, methadone, Neurontin, Cymbalta, and psychological

7

consultation.

On November 21, 2006, Jackson reported that she had fallen twice in the past month because her right leg gave out.  Tr. at 412.

Jackson visited psychologist Jill H. Mushkat, Ph.D., on November 30, 2006 for pain management.  Tr. 410-11.  Jackson complained of lower back and abdominal pain, usually at an intensity of seven on a ten-point scale.  Jackson reported that movement increased the pain and lying in bed decreased it.  Jackson denied having physical therapy or mental health treatment for pain or other issues.  Her current medications included methadone, Cymbalta, and Neurontin.  Jackson also reported that her mother and two younger siblings would be moving in with her and that this would be very stressful.  Jackson did not exhibit pain during her visit, but she consistently bit her nails and admitted to being a nail biter. Jackson did exhibit a slow gait and slight limp.  She admitted occasional memory problems; changes in mood; feelings of anger, anxiety, and depression; and trouble sleeping.  She denied suicidal ideation.  Jackson did not exercise and spent most of her time at home or visiting grandchildren.  She split household chores with others in the house.  She admitted that she hated her life.  Dr. Mushkat diagnosed Jackson as suffering from a pain disorder and recommended psychological counseling, self-relaxation, and possible referral for pain support and psychiatric evaluation.

Jackson received caudal steroid injections on Decmber 6, 2006 and December 22, 2006.  Tr. at 424, 425.

When Jackson visited Dr. Mushkat on December 14, 2006 she again told the doctor that she hated her life.  Tr. at 409.  Jackson reported having no social life and staying in bed frequently.  Jackson expressed doubts that the anti-depressant was working.  She

8

reported pain but exhibited no pain behavior, although she did appear anxious.

On January 11, 2007, Dr. Mushkat noted that Jackson had missed appointments with her and with a physician because she lacked transportation.  Tr. at 408.  Jackson reported depression and staying in bed.  Dr. Mushkat consulted with a physician regarding Jackson's dosage of anti-depressants, and the doctor agreed that the dosage given had been much too low.

On February 8, 2007, Dr. Mushkat expressed concern about Jackson's ability to handle stress.  Tr. at 407.  By February 20, 2007, Jackson's dosage of anti-depressants had been increased, and she was doing better.  Tr. at 408.

Jackson reported continuing back and leg pain on February 20, 2007, including pain radiating into the groin.  Tr. at 403.  She also reported, however, that the nerve blocks had been somewhat effective.  Her physician, Dr. Allen, planned three additional nerve blocks. Tr. at 403.  She received these injections on February 28, 2007, March 7, 2007, and March 14, 2007.  Tr. at 419-22.

On March 6, 2007, Dr. Mushkat noted that Jackson still tended to withdraw into her room despite being more interactive.  Tr. at 402.  On March 27, 2007, Jackson's stress had increased, and Dr. Mushkat noted that she was having difficulty relaxing.  Tr. at 438.

Jackson visited Dr. Allen on April 10, 2007.  Tr. at 433.  She reported improvement in her pelvic pain but also said that she still had a lot of back pain.  Dr. Allen found tenderness in the lumbosacral spine and joint aggravation from flexion and extension. Straight leg tests were positive bilaterally.  Dr. Allen increased Jackson's dosages of Cymbalta and Methadone.  Dr. Allen administered bilateral lumbar facet injections for lumbar spondylosis on April 27, 2007, May 4, 2007, and May 11, 2007.  Tr. at 422, 440,

9

441.

During Jackson's April 1, 2007 session with Dr. Mushkat, Jackson fell asleep while doing relaxation exercises after complaining about increased pain and decreased sleep. Tr. at 437.  On April 24, 2007, Dr. Mushkat noted that Jackson could not wear regular shoes and was having trouble walking because of leg, ankle, and thigh swelling.  Tr. at 436.

On July 3, 2007, Dr. Allen noted that Jackson was maintaining functionality on medications but was still having significant pain and was overweight.  Tr. at 554.  He concluded that Jackson needed physical therapy, particularly aqua therapy.  Jackson gave no signs of distress during the meeting.

Christine L. Ontko, M.S., completed a physical capacity evaluation of Jackson on September 19, 2007 at South Pointe Hospital.  Tr. at 461-63.  Jackson reported a history of depression and exhibited depressed mood.  Jackson told Ontko, "When my kids are gone so will I be."  Tr. at 461.  Ontko tested perception, motor planning and body integration, strength, flexion and extension, fine and gross motor skills, and repetitive endurance.  Ontko concluded that Jackson was capable of sedentary work, with a lifting ability of 14 pounds occasionally, seven pounds frequently, and three pounds constantly. Ontko recommended, however, that before Jackson return to work she undergo a course of physical/occupational therapy to address back pain and improve posture and endurance. Ontko also recommended that before Jackson return to work, her depression should be brought under better control.  Finally, Ontko recommended that Jackson increase her activity level, as she spent too much time in bed.

A nursing note from Euclid, Hillcrest, Huron and South Pointe Hospitals Pain Management on September 15. 2007 indicated that Jackson's upper abdominal pain was

increasing and back pain was still present.  Tt. at 464.

According to physical therapy notes on October 2, 2007, Jackson reported constant low back pain and that her legs sometimes gave out.  Tr. at 467.  She could walk 1-2 hours, but she reported pain worsening with movement, walking, sitting, and bending.  She also reported spending most of her time in bed and that she experienced a "chest pulling" feeling in the prone position.  Tr. 467.  Jackson started a series of lumbar facet radiofrequency ablations on October 5, 2007.  Tr. at 471, 472.

On February 12, 2008, Jackson reported to Dr. Allen that pain was limiting her ability to function and that she was experiencing increased stress.  Tr. at 491.  Dr. Allen opined that Jackson needed to continue seeing her psychologist and recommended psychiatric treatment.  Dr. Allen gave Jackson an injection for pelvic pain on March 1, 208.  Tr. at 494.

Also on February 12, 2008, Jackson visited Dr. Mushkat.  Tr. at 493.  Jackson expressed a great deal of anger because she thought that she might lose her children for neglect because one daughter was not going to school and Jackson was not aware of this.  Dr. Mushkat also found Jackson to be depressed.  She prescribed psychiatric counseling to help Jackson vent anger and frustration, as that would improve her ability to deal with pain.

After Jackson's initial applications for SSI and DIB had been denied but before her hearing before the ALJ, Jackson submitted the following records to the Commissioner.

On November 29, 2004, Jackson saw Dr. Margoulias, at Lee-Harvard.  Tr. at 249-51.  Jackson reported continued cramps and that the Tylenol and Ultram were not working.  She also reported suicide attempts when she was 21 and 15, but she denied any current suicidal thoughts.  She admitted that she was depressed and that she felt tired but was

unable to sleep.  Dr. Margoulias diagnosed depression and fatigue, prescribed Zoloft, and gave her information about depression.

Jackson visited Dr. Magoulias on May 31, 2005.  Tr. at 247.  She reported that she had insomnia even though she took Trazodone every two hours.  Jackson denied depression.  Dr. Margoulias prescribed Restoril and recommended counseling, but Jackson was not interested in counseling.[1]

C.      Hearing testimony

Jackson testified at her hearing on June 17, 2008.  Tr. at 28-56.  Jackson testified that she lived with her two daughters, ages 15 and 10, in a three bedroom house.  Her daughters did the household chores, for the most part.  She said that she had difficulty being around other people and "just didn't really care to be bothered with anybody."  Tr. at 44.  Jackson stayed in her room during the day because she did not want to be around other people, and she got rid of the couches in her house because she did not want to have company.  Her regular visitors consisted of her mother, her two brothers, and three friends.

Jackson testified that she had suicidal thoughts and did not handle stress well, particularly family-related stress.  She also testified that her antidepressants helped a little.

The ALJ did not call on a medical expert to testify.  When the VE testified, the ALJ asked the VE to assume a younger individual with a high school education and Jackson's past work experience who could function at the light exertional level, lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk with normal breaks for six

---

[1]     Jackson also provided the notes for a September 23, 2005 session with Dr. Moufawad to the Commissioner after reconsideration of Jackson's application. However, the notes for the September 23, 2005 session are identical to the notes for a September 20, 2005 session that Jackson provided at the initial consideration stage. See supra, p. 5.

hours out of an eight-hour workday, and was limited to simple and repetitive tasks, no contact with the general public, and limited contact with fellow employees.  The ALJ then asked if such an individual would be able to perform Jackson's past work, and the VE opined that the individual could not.  When asked, the VE testified that such an individual could perform work in the national economy, including a housekeeping cleaner and production assembler.  According to the VE, such jobs would permit no more than two days' absence a month.  The VE added that if Jackson were unable to begin work before 8:00 p.m., the number of jobs would be reduced by half.  When the ALJ asked the VE to assume the same individual but limited to sedentary work and asked if there were any jobs in the national economy for such an individual, the VE said that there were.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a

13

finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R.  §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In relevant part, the ALJ made the following findings:

1.    Ms. Jackson met the insured status requirements of the Social Security Act through December 31, 2007.

2.    Ms. Jackson has not engaged in substantial gainful activity since August 31, 2002, the alleged onset date.

3.    Ms. Jackson has the following severe impairments:  status post multiple abdominal surgeries; extensive abdominal adhesions; chronic back pain; and depression.

4.    Ms. Jackson does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that Ms. Jackson has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).  Specifically, she can lift, carry, push and pull 20 pounds occasionally and ten pounds frequently.  She can sit for six hours and stand and/or walk for six hours in a normal workday.  She is limited to simple routine tasks that do not involve contact with the general public.  She is limited to brief, superficial contact with coworkers and

14

supervisors.

6.  Ms. Jackson is unable to perform any past relevant work.

7.  Ms. Jackson was born on January 2, 1976 and was 36 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.  Ms. Jackson has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Ms. Jackson is "not disabled," whether or not she has transferable job skills.

10.  Considering Ms. Jackson's age, education, work experience, and residual functional capacity, there are jobs that exist in th significant numbers in the national economy that she can perform.

11.  Ms. Jackson has not been under a disability, as defined in the Social Security Act, from August 31, 2002 through the date of this decision.

Tr. at 17-24.

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of  more  than  a  mere  scintilla  of  evidence  but  may  be  somewhat  less  than  a

15

preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

VI.  Analysis

Jackson claims the ALJ erred because (1) the ALJ failed to elicit at the hearing the opinion of a medical or psychological expert regarding Jackson's mental impairments and (2) the ALJ failed to include the limitations resulting from Jackson's mental impairments in his hypothetical question to the VE and in his assessment of Jackson's RFC.   The Commissioner denies that the ALJ was required to consult a medical expert regarding Jackson's medical impairments or that the ALJ failed to include the limits resulting from Jackson's mental impairments in his hypothetical question to the VE.

A.     *Whether the ALJ erred in failing to elicit at the hearing the opinion of a medical or psychological expert regarding Jackson's mental impairments*

For the first time and at the ALJ level, Jackson asserted her claim that she was disabled due to depression.  After initial consideration and reconsideration of her claims, she requested an administrative appeal of her case, added a claim that she was disabled due to depression, and submitted to the ALJ new documents in support of that claim.

When a claimant alleges mental disability, 20 C.F.R. § 1520a requires the Commissioner to apply a special technique to evaluate the severity of the claimant's limitations.  First, the Commissioner must evaluate the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment.  If the claimant is found to have such an impairment, the Commissioner must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment.  Second, the Commissioner must rate the degree of

16

functional limitation resulting from the impairment in four broad functional areas:  Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  In the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), the Commissioner uses a five-point scale indicating none, mild, moderate, marked, or extreme. When rating episodes of decompensation, the Commissioner uses a four-point scale indicating none, one or two, three, four or more. The last point on each scale represents a degree of limitation incompatible with the ability to do any gainful activity.  A score of "none" or "mild" in the first three criteria and a rating of "none" in the fourth will usually result in a finding that the claimant does not have a serious mental impairment.  If the impairment is found to be severe, the Commissioner will determine if it meets or equals a listing.  If it does not, then the Commissioner will assess the claimant's RFC.

When the mental RFC assessment is done for the first time at the ALJ level, 20 C.F.R. § 404.1520a(e)(2) requires that application of the technique must be documented in the ALJ's decision.  The written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment. The decision must include a specific finding as to the degree of limitation in activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  Section 404.1520a(e)(3) provides in relevant part as follows:  "If the administrative law judge requires the services of a medical expert to assist in applying the technique but such services are unavailable, the administrative law judge may return the

17

case to the State agency or the appropriate Federal component . . . ."

The Commissioner argues that § 404.1520a(e)(3) recognizes that the ALJ has discretion whether to consult a medical expert to ascertain a claimant's mental limitations when the claimant raises a claim of disability for the first time with the ALJ.  Section 404.1520a(e)(3), however, is ambiguous.  It may be interpreted to imply that the ALJ has discretion to enlist the aid of a medical expert only when he deems it necessary.  It may also be interpreted to mean that although the ALJ must have an expert medical opinion, the ALJ may obtain such an opinion through remand rather than through enlisting a medical expert at the administrative level.

The Commissioner also cites *Klobas v. Astrue*, 2010 WL 383141, at *4 (D. Colo. Jan. 29, 2010), in support of his contention that the ALJ has discretion whether to consult a medical expert to ascertain a claimant's mental limitations when the claimant raises a claim of disability for the first time with the ALJ.  *Klobas* held, in relevant part, as follows:

> At the initial determination level, the Commissioner has a duty to ensure that a psychiatrist or psychologist has reviewed the case file and undertaken the special psychiatric review technique.  *See* 42 U.S.C. § 421(h); 20 C.F.R. § 404.1520a(e)(1). When this case was presented for initial review, however, plaintiff did not allege a mental impairment.  (*See* Tr. 88.)  When evidence of a mental impairment arises at the administrative hearing level, as it did here, the ALJ has discretion to consult a psychiatrist or psychologist in applying the special technique.   20 C.F.R. § 404.1520a(e)(3); *see also Andrade v. Secretary of Health and Human Services,* 985 F.2d 1045, 1049 (10th Cir.1993).  Where the record, as here, lacks any evidence undermining the ALJ's determination of plaintiff's mental residual functional capacity and that determination is otherwise amply supported by the evidence of record, remand is not warranted.  *See Andrade,* 985 F.2d at 1050 (citing *Bernal v. Bowen,* 851 F.2d 297, 302 (10th Cir.1988))

*Klobas v. Astrue*, 2010 WL 383141, at *4 (D. Colo. Jan. 29, 2010).

*Klobas* cites § 404.1520a(e)(3) and *Andrade v. Secretary of Health and Human Services,* 985 F.2d 1045 (10th Cir. 1993), for its determination that the ALJ has discretion

whether to consult a medical expert to ascertain a claimant's mental limitations when the claimant raises a claim of disability for the first time at the administrative level. *Andrade*, in turn, cites 20 C.F.R. §§ 404.1520a(d)(1)(i) & 416.920a(d)(1)(i) ("§§ 404.1520a(d)(1)(i) & 416.920a(d)(1)(i)"), in support of that proposition. *Andrade,* 985 F.2d at 1049. *Andrade* described the provisions of §§ 404.1520a(d)(1)(i) & 416.920a(d)(1)(i) and related sections as follows:

> When a claimant's severe mental impairment does not meet a listed mental impairment, the standard document must include an assessment of the residual functional capacity. *Id.* §§ 404.1520a(c)(3) & 416.920a(c)(3). The document must be completed at the "initial, reconsideration, administrative law judge hearing, and Appeals Council levels." *Id.* §§ 404.1520a(d) & 416.920a(d). At the initial and reconsideration levels, the document must be completed and signed by a medical consultant. *Id.* §§ 404.1520a(d)(1) & 416.920a(d)(1). The ALJ, however, may complete the document without the assistance of a medical advisor. *Id.* §§ 404.1520a(d)(1)(i) & 416.920a(d)(1)(i). When the issue of a mental impairment arises for the first time at the ALJ hearing level, the ALJ may choose to remand the case to the State agency for completion of the document and for a new disability determination. *Id.* §§ 404.1520a(d)(1)(iii) & 416.920a(d)(1)(iii).

*Andrade*, 985 F.2d at 1049.

Although 20 C.F.R. §§ 404.1520a(d)(1)(i) & 416.920a(d)(1)(i) eliminate the ambiguity in § 404.1520a(e)(3) by making it clear that the ALJ does, indeed, have discretion whether to consult a medical expert to ascertain a claimant's mental limitations when the claimant raises a claim of disability for the first time at the administrative level, the problem for resolving the current case is that §§ 404.1520a(d)(1)(i) & 416.920a(d)(1)(i) no longer exist. The code section which §§ 404.1520a(d)(1)(i) & 416.920a(d)(1)(i) were meant to clarify and elaborate, however, 42 U.S.C. § 421(h), is still in effect. A reasonable reading of that statute supports the conclusion that the ALJ has discretion whether to consult a medical expert to ascertain a claimant's mental limitations when the claimant raises a claim of

disability for the first time at the administrative level.[2]

In the present case, the ALJ determined that Jackson's depression was a serious medically determinable medical impairment.  Tr. at 17.  The ALJ then rated Jackson's degree of functional limitation resulting from her depression with regard to activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  The ALJ rated Jackson's activities of daily living as mildly restricted; her social functioning as mildly restricted; and her concentration, persistence, and pace as moderately restricted. Tr. at 18.  He also found that Jackson had not experienced any episodes of decompensation.  *Id.*  Because none of Jackson's mental impairments reached the "marked" level and Jackson had not experienced "repeated" episodes of decompensation, the ALJ found that Jackson's depression did not meet or medically the listing at 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.  The ALJ also made a more detailed

---

[2]  Subsection 42 U.S.C. § 421(h) ("§ 421(h)") reads as follows:

(h) Evaluation of mental impairments by qualified medical professionals

An initial determination under subsection (a), (c), (g), or (i) of this section that an individual is not under a disability, in any case where there is evidence which indicates the existence of a mental impairment, shall be made only if the Commissioner of Social Security has made every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment.

Subsections 421 (g) & (i) are not applicable to the current case.  Subsections 421 (a) & (c) refer to the initial and reconsideration levels of a social security determination.  Conspicuously absent from § 421(h) is any mention of § 421(d), review on the administrative level.  Consequently, the statutory requirement that the Commissioner make "every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable residual functional capacity assessment" does not apply to initial determinations regarding mental disability at the administrative level.

assessment of Jackson's RFC and described the pertinent evidence in the record that was the basis for his assessment. Tr. at 19-23. The ALJ, therefore, applied the special technique and documented his application of that technique. That is all that the code and the regulations require.

For these reasons, the ALJ did not err in not eliciting at the hearing the opinion of a medical or psychological expert regarding Jackson's mental impairments.

B.      *Whether the ALJ erred by failing to include the limitations resulting from Jackson's mental impairments in his hypothetical question to the VE and in his assessment of Jackson's RFC*

Jackson contends that the ALJ's finding that Jackson's depression resulted in moderate difficulties with concentration, persistence, and pace required him to articulate a more restrictive hypothetical question to the VE than he did and to include additional limitations in Jackson's RFC. The ALJ might have found greater restrictions, Jackson argues, if he had properly performed an analysis of Jackson's RFC, as required by stages four and five of the sequential analysis. According to Jackson, the ALJ failed to conduct such an analysis. Jackson also cites *Ealy v. Commissioner of Social Sec.* 594 F.3d 504 (6th Cir. 2010), in support of her contention that a finding of moderate difficulties with concentration, persistence, and pace required the ALJ to find greater restrictions in Jackson's functioning than he did. The Commissioner replies that the ALJ properly assessed Jackson's RFC, that Jackson misreads *Ealy*, and that the ALJ's question to the VE properly reflected his assessment of Jackson's RFC.

Jackson notes that a finding of moderate difficulties with concentration, persistence, and pace requires the ALJ to perform a detailed assessment of a claimant's RFC at stages four and five of the sequential evaluation. Jackson claims that the ALJ failed to carry out

21

such an assessment.  Jackson errs.  The ALJ did, in fact, carry out the required detailed assessment.  Tr. at 19-23.  The ALJ reviewed the evidence on the record related to Jackson's physical and mental impairments and concluded that she was capable of performing a range of light work, including being able to lift, carry, push and pull 20 pounds occasionally and ten pounds frequently; sit for six hours and stand and/or walk for six hours in a normal workday; perform simple routine tasks that do not involve contact with the general public; and endure no more than brief, superficial contact with coworkers and supervisors.  Tr. at 19-23.  The ALJ concluded, "There is nothing in the record that convinces me that any further reduction in the residual functional capacity I have assessed would be justified."  Tr. at 23.

Jackson argues that *Ealy* precludes the ALJ from finding that a limitation to  simple, repetitive tasks and non-public work settings is sufficient to adequately address the limitations implicit in moderate difficulties with concentration, persistence, and pace.  As the Commissioner points out, this argument misreads *Ealy*.  In *Ealy*, the record showed that the claimant had limited ability to maintain attention over time, even when performing simple, repetitive tasks.  The ALJ's limitation of Ealy to simple, repetitive tasks, therefore, failed adequately to capture Ealy's limitations in concentration, persistence, and pace.  The Sixth Circuit has not found that in *all* cases in which an individual has moderate limitations in concentration, persistence, and pace a finding that the claimant is limited to simple, repetitive tasks is not sufficient to encompass those limitations.

In addition, Jackson fails to specify in which respects the restrictions to simple routine tasks that do not involve contact with the general public and no more than brief, superficial contact with coworkers and supervisors inadequately accommodate her mental

22

limitations. Nor does Jackson refer to the record to support her contention that the restrictions found by the ALJ are insufficient to accommodate her mental RFC. Absent a showing that the ALJ's RFC findings regarding Jackson's mental impairments were inadequate or that the ALJ failed to include those findings in his hypothetical to the VE, Jackson has not shown that the ALJ erred by failing to include limitations in his hypothetical question to the VE and in his assessment of Jackson's RFC. For these reasons, Jackson's argument to the contrary is not well-taken.

### VII. Decision

For the foregoing reasons, the decision of the Commissioner should be AFFIRMED.


Date: July 20, 2011                          s/ Nancy A. Vecchiarelli
                                                    U.S. Magistrate Judge


## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**